William C. VASSELL Plaintiff,

v.

**RELIANCE SECURITY GROUP, PLC, Command Security Corporation, and GCM Security Partners, LLC, Defendants.**

**No. 04 CIV. 2657 CM GAY.**

United States District Court, S.D. New York.

June 18, 2004.

J. Joseph Bainton, John Gerard McCarthy, Sr., Bainton McCarthy LLC, New York, NY, for Plaintiff.

Jay Warren Freiberg, Katten Muchin Zavis Rosenman, New York, NY, James Martin Reilly, Herzog, Engstrom & Koplovitz, P.C., Albany, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

### BACKGROUND

*The Parties*

In 1980, Plaintiff William C. Vassell ("Vassell"), a citizen of Connecticut, founded Defendant Command Security Corporation ("Command"), a New York corporation, for the purpose of "principally provid[ing] uniformed security services to commercial, financial, industrial, aviation and governmental clients in the United States." [Galloway Decl., ¶ 9]. Vassell also became the President and Chief Executive Officer ("CEO") of Command as well as Chairman of its Board of Directors ("Chairman").

In 1995, the Securities and Exchange Commission demanded that Command restate its earnings and financial condition. Command complied with this demand by

retracting its prior report of a profit and reporting instead a loss of approximately $3 million. On February 24, 1995, Vassell resigned as Command's President and CEO, but retained his title as Chairman. [Kikis Decl., Ex. C]. Command did not appoint a replacement President or CEO.

In 1997, Peter T. Kikis, a then Command shareholder and Board Member, together with other minority shareholders and directors, filed a derivative action in the Supreme Court, New York County, entitled *Rosan, et al. v. Vassell,* et al., Index No. 606166/97 (Cahn, J.), alleging, in the words of Justice Herman Cahn, "a scheme by defendant Vassell to keep Command under his total and complete control" and seeking the appointment of a temporary receiver to manage Command during the litigation. [Kikis Decl., ¶ 4].

In 1998, the New York Supreme Court granted the application, finding that "Vassell acting as Chairman of the Board has effectively usurped the authority of the plaintiff directors and continues to run Command as his own fiefdom," and appointed a temporary receiver. The decision was affirmed by the Appellate Division. *See Rosan v. Vassell,* 257 A.D.2d 436, 683 N.Y.S.2d 516 (1st Dep't 1999). The litigation settled on the basis of a sale of the dissident shareholders' interests in Command to Defendant Reliance Security Group, plc ("Reliance"), a public company organized under the laws of England and Wales that maintains its principal place of business in the United Kingdom. The sale was approved by Command's shareholders and consummated in September 2000. [*Id.,* ¶ 6].

On September 12, 2000, in connection with Reliance's purchase of the Command shares of the capital stock and warrants, Vassell, Reliance and Command entered into a written Shareholders' Agreement (the "Shareholders' Agreement").

Since September 2000, in accordance with the Shareholders' Agreement, Command's Board of Directors has consisted of seven members, three of whom were nominated by Vassell (the "Vassell Board Members")—Peter J. Nekos ("Nekos"), Gregory Miller ("Miller") and Vassell himself—three of whom were nominated by Reliance (the "Reliance Board Members")—Graeme Halder ("Halder"), Jeremy Simon ("Simon") and Neil French ("French")—and one of whom was nominated jointly by Vassell and Reliance (the "Neutral Board Member")—Carl E. Painter ("Painter").

After the terrorists attacks of September 11, 2001, changes in federal law operated to disqualify Command from bidding for lucrative government contracts in the homeland security because a portion of Command's stock was owned by Reliance, a foreign entity. This change in federal law led Reliance to announce that it would be in the best interests of itself and Command for Reliance to sell its Command securities to domestic owners who would not disqualify Command from bidding for homeland security contracts. [Galloway Decl., ¶ 14]. Following the announcement, Reliance began to pursue a variety of potential purchasers for its shares. In July 2002, Reliance was engaged in negotiations with a prospective purchaser named Kushner. Because the terms of the Kushner transaction would have required the approval of Command's Board of Directors, Vassell proposed, and Command's Board of Directors approved, the creation of an "Independent Committee" to review and approve or disapprove the contemplated transaction on behalf of Command. The Board named as members of this "Independent Committee" Vassell, Nekos and Miller—the three directors who had been nominated by Vassell—and the single neutral director, Painter. The Board deemed the three Reliance-nominated directors to

be interested in the potential Kushner transaction and therefore ineligible to serve on the "Independent Committee." [Galloway Decl., ¶ 16]. The Kushner transaction was never completed. [GCM 56.1 Statement, ¶ 23].

*The Right of First Offer and the GCM Transaction*

At all relevant times prior to the commencement of this action, Reliance and Vassell were the two largest shareholders of Command. Reliance has a beneficial ownership of Command common stock, shares of convertible preferred stock and warrants for the purchase of stock that if converted and exercised, would give it a controlling interest (50.6%) in Command. Vassell holds beneficial ownership of an approximately 9.7% interest in Command. [Galloway Decl., ¶¶ 4–5].[1]

Under Section 2.1(a) of the Shareholders' Agreement, Reliance and Vassell agreed to give each other a right of first offer before either one could sell its interest in Command. Specifically, Section 2.1(a) states,

> The Selling Holder shall deliver a notice ("Notice") to the Non–Selling Holder stating (i) its bona fide intention to offer such Holder Shares, (ii) the number of such Shares to be offered (the "Offered Shares"), and (iii) the price and terms, if any, upon which it proposes to offer such Shares.

Section 2.1(b) states, "Within 30 days after giving Notice, the Non–Selling Holder may elect to purchase the Offered Shares, at the price and on the terms specified in the Notice." Section 2.1(c) states,

> If all Shares which the Non–Selling Holder is entitled to obtain pursuant to

Section 2.1(b) are not elected to be purchased, the Selling Holder may, during the 90–day period following the expiration of the period provided in Section 2.1(b), offer the remaining unpurchased portion of such Shares to any person or person at a price not less than, and upon terms no more favorable to the offeree than those specified in the Notice.

2.1(d) states,

> If the Selling Holder does not sell or enter into an agreement for the sale of the Shares within such 90–day period, or if such agreement is not consummated within 30 days of the execution thereof, the right provided under this Section 2.1 shall be deemed to be revived and such Shares shall not be offered or sold unless first reoffered to the Non–Selling Holder in accordance herewith.

On December 12, 2003, Command entered into a financing agreement with CIT Group/Business Credit, Inc. ("CIT"), pursuant to which Command obtained a $15 million revolving line of credit from CIT (the "Financing Agreement"). The Financing Agreement references certain "Default Events" which would cause Command to lose its right to borrow under the revolver. Section 10.1(i) of the Financing Agreement states that an "Event of Default" occurs immediately upon "the failure of William Vassell for any reason whatsoever to be the Chairman of the Board of Directors and Chief Executive Officer of the Company or to be actively engaged in management of the Company." Section 10.1(j) states that an "Event of Default" occurs immediately upon either (i) the sale by Reliance of "any of its shares" in Command "without obtaining the prior written consent of CIT, such consent not to be

---

**1.** At oral argument, counsel for Reliance stated that only approximately 25% of its beneficial ownership consists of currently exercisable common stock. To obtain control, Reliance (and now GCM) would have to convert the preferred stock and exercise the warrants.

unreasonably withheld" or (ii) William Vassell shall fail to own, at any time that he is employed by the Company, at least 500,000 shares of voting common stock of the Company."

On January 16, 2004, Reliance noticed Vassell of its bona fide intention to sell its shares in Command (the "Command Securities") at a price of $2.85 million with no terms other than "payable in cleared funds on closing" (the "January 16 Notice"). [Compl., Exh. B]. Vassell alleges that, although he wanted to purchase Reliance's Command Securities, he was unable to raise the necessary $2.85 million within the 30 days contemplated by the Shareholders' Agreement and therefore did not exercise his right of first offer. [Am. Cmpl., ¶ 16]. As a result, Reliance was at liberty for 90 days, beginning February 15, 2004, to sell or enter into an agreement to sell the securities to a third-party at a price and on terms no more favorable to the third party than the price and terms specified in the notice to Vassell. The 90-day period expired on May 15, 2004.

Reliance did not sell its Command Securities by May 15, 2004, but it did enter into an agreement to sell its shares to GCM Security Partners, LLC ("GCM"), a third party, prior to that date.[2] The parties disagree over whether the terms of that agreement were more favorable to the third party than were offered to Vassell.

On March 1, 2004, Neil French, the Group Finance Director for Reliance and Command Board member, sent a letter to Vassell (the "March 1 Letter"), advising him that GCM was "in funds" and therefore could "complete very quickly" its purchase of Reliance's shares. [*See* Compl., Ex. B]. The letter further states that GCM "need[s] to be authorized to talk to CIT,"

and that "In the circumstances, it seems to me that your [Vassell's] clear duty now is to enter into a businesslike discussion with Bruce Galloway [of GCM] to facilitate their consortium's immediate entry into Command." Plaintiff, originally took the position (since withdrawn) that this letter, in combination with two alleged oral conversations between Vassell and French of Reliance and Bruce Galloway ("Galloway") of GCM, evidences the existence an agreement by Reliance to sell its Command securities to GCM sometime prior to March 5, 2004. [Compl. ¶¶ 20–22].

In his Declaration, French acknowledges that on or about March 1, 2004, he did tell Vassell that GCM was considering a proposal to acquire the Reliance's Command Securities, and that he requested permission to discuss the proposal with CIT. [French Decl., ¶ 13]. French states (and apparently Vassell has conceded) that those discussions did not result in an agreement. He has produced to the Court an email, dated March 3, 2004, to the Command Directors Halder, Miller, Painter, Nekos and Simon, in which he writes "[a]s you are no doubt aware, discussions between [Vassell] and [GCM] are ongoing. The outcome is uncertain." [French Decl., Exh. B]. French further alleges that he never received authorization to meet with CIT and that he refused to meet with CIT without Command's permission (so as to avoid any action which might be alleged to constitute interference with the relationship between CIT and Command). [Supp. Galloway Decl., ¶ 3]. Galloway similarly declares that "As of March 5, 2004, Reliance and GCM still were engaged in ongoing negotiations toward a definitive and binding agreement." [Galloway Decl., ¶ 24].

---

**2.** I reject Vassell's arguments that no such agreement was reached until either May 14 or

May 20. *See infra,* pp. 472–73.

GCM has produced to the Court a copy of a letter of intent between Reliance and GCM, dated March 2, 2004 and signed by French and Galloway, which states, in relevant part,

This letter (the "Letter") sets forth our intention with respect to the proposed purchase (the "Purchase") by GCM Security Partners, LLC or an affiliate of Galloway Capital Management, LLC ("Buyer") of the equity interest in Command Security Coporation, a New York corporation (the "Corporation"), owned by Reliance Security Group, PLC . . .

This Letter is solely a basis for the negotiation of a definitive agreement governing the Purchase (the "Definitive Agreement"). It is understood that this Letter does not contain all of the material terms of the Purchase and except for paragraphs 4, 6, 7, 8 and 9, which are binding agreement between the Parties, this Letter is not a binding agreement and does not create any legal obligation of any nature, whatsoever.

[Galloway Decl., Exh. C]. Paragraphs 4, 6, 7, 8 and 9, relate to (1) an exclusivity period (¶ 4), (2) a bar on public announcements (¶ 6), (3) a provision regarding responsibility for costs and expenses (¶ 7), (4) a provision about governing law (¶ 8), and (5) a consent to jurisdiction in New York (¶ 9).

On March 4, 2004, as part of the ongoing negotiations, Galloway sent a memorandum to French in which he proposed a revised structure to the Purchase Agreement. The letter sought to, among other things, add as a condition to closing that "Command will enter into an agreement with Mr. Vassell to purchase and cancel all of the Command shares, options and warrants that he owns on the closing date and provide a severance package that will ensure a smooth transition to a new management and his ongoing cooperation with the business affairs of Command." [Supp. Galloway Decl., Exh. A]. There is no evidence that GCM and Reliance ever came to an agreement on the revised structure proposed in the March 4, 2004 memorandum. However, on March 11, 2004, Vassell sent a letter to Galloway setting forth "the terms pursuant to which" he would enter into an agreement with GCM. He concluded the letter by stating that "If it looks like your acquisition of control of Command is going to take place, we will have ample opportunity to discuss these and any other appropriate terms in detail." [Supp. Galloway Decl., Exh. B].

*The Purchase Agreement*

On April 23, 2004, Reliance and GCM entered into a written agreement for the sale and purchase of Reliance's Command securities (the "Purchase Agreement" or the "April 23 Agreement"). Article 6 of the Purchase Agreement sets forth certain "Conditions To Closing" the sale. Specifically, Section 6.3, entitled "Conditions to Obligations of Purchaser," states, in relevant part, that

The obligations of Purchaser [GCM] to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following additional conditions

(c) All members of the Company's Board of Directors that have been nominated or appointed by Seller shall have submitted their resignations as of the Closing Date.

(d) Vassell shall either have resigned or shall have been terminated as an officer and employee of the Company and all of its subsidiaries, effective on or prior to the Closing.

(e) CIT Group Inc. shall have agreed in writing that no default or event of default under its credit facility with the

Company exists as of the Closing or shall occur or have occurred as a result of the consummation of the transactions contemplated hereby.

[Plf.'s 56.1 Statement, Exh. 6]. Section 7.3 of the Purchase Agreement, entitled "Waiver," states in relevant part,

> At any time prior to the Closing, either of the parties hereto may ... (c) waive compliance with ... any condition to its own obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.

[*Id.*]

On April 26, 2004, GCM publically disclosed the existence of the Purchase Agreement when it filed with the SEC Amendment No. 1 to its Schedule 13–D. [Galloway Decl., ¶ 21; Plf.'s 56.1 Statement, Exh. 8]. The filing stated, in relevant part,

> The closing of the purchase and sale of the Reliance Securities by GCM is scheduled to occur as soon as practicable following the satisfaction of certain conditions, including (i) the termination of Vassell, or his resignation from, all position as an officer or employee of the Company and its subsidiaries and (ii) the Company's lenders shall have agreed in writing that no default or event of default shall occur or has occurred as a result of consummation of the sale and purchase of the Reliance Securities and the termination of Vassell.

[Plt.'s 56.1 Statement, Exh. 7]. On the same day, Reliance filed Amendment No. 3 to its own Schedule 13–D disclosing the existence of the Purchase Agreement, and attaching a copy of the agreement as an exhibit. [*Id.*, Exhs. 5 & 6].

The purchase of Vassell's shares by GCM was not mentioned in the Purchase Agreement, and there is no indication in the record before me that GCM has any interest in purchasing those shares—which may explain the events that ensued.

On May 7, 2004, Gary Herman, a managing member of GCM Capital Management Co., a non-party, received a telephone call from Vassell during which Vassell allegedly told him that "you guys will put the company in harm's way" and that "if you don't back off, I am going to run this company right into the ground." [Herman Decl., ¶ 3]. Vassell denies ever having made this statement. [Vassell Decl., ¶ 8].

*The May 13 Board of Directors Meeting*

On May 13, at the request of the Reliance Command Board members, Command held a meeting of its Board of Directors. Present at the meeting were Board members Vassell, Painter, Nekos, Halder, Simon, French and Miller. Command's counsel David Pollitzer and Seth Finkel were also present. Vassell appointed Mr. Finkel secretary of the meeting, and asked him to keep the minutes. Vassell then read verbatim the following rules of order for the meeting,

> c. Given that the second item on the agenda calls for consideration of authorization for GCM to meet with CIT, the following points of order shall be adhered to:
>
> i. No member of the Board who directly or indirectly has an interest in the outcome of a motion shall be permitted to make the motion, second the motion, participate in the discussion following the motion or vote with respect to the motion.
>
> ii. The fact that Reliance has an obvious economic interest, to the extent of $2.85 million, in the outcome of any motion concerning the satisfaction of the conditions in its contract with GCM causes its employees and directors on

the Board to be interested directors and therefore not eligible to properly vote.

iii. Given that my personal interests could be adversely affected indirectly by a motion concerning authorization for GCM to meet with CIT, I shall, for purposes of the meeting, abstain from such vote.

iv. Therefore, should any motion which concerns GCM's meeting with CIT be properly brought before the meeting, the only permitted motions, seconds, discussion and vote will be among Mssrs. Miller, Nekos and Painter. Any such actions by others shall be ruled out of order.

Vassell designated these three Board members (i.e. Miller, Nekos and Painter) the "Independent Committee." Board member French objected to the rules of order, in response to which Vassell stated that "he would not permit interested directors to vote." Command's counsel, Mr. Pollitzer, stated that "counsel had advised the Chairman that neither the Chairman nor the Reliance directors should vote on matters as to which they had either a direct or indirect financial interest."

Thereafter, Miller handed out a packet containing his Report of the Independent Committee and Nekos's and Painter's individual reports summarizing their recommendations on the GCM proposals. After Board members Nekos and Miller had given oral reports recommending the rejection of GCM's application to meet with CIT, Mr. Painter provided his own report in support of the GCM application. The Minutes capture the conclusion of Painter's statement as follows:

> Mr. Painter then discussed his meeting of May 5, along with corporate counsel D. Pollitzer, with the GCM group, which he also had reviewed with the Independent Committee on May 6. (A written report of this meeting was sent to the Committee May 10 and Mr. Painter requested that it be made part of the minutes). He noted that Mssrs. Miller and Nekos had refused to attend this meeting and that, in his opinion, they were not really interested in making a good faith effort to learn all they could about GCM and to discuss with GCM their answers to the questions which the Committee had sent to them.

Towards the end of the meeting, Vassell asked whether the "Independent Committee" had reached a conclusion as to their recommendation on the GCM application. Mr. Miller stated, "as indicated on the first page of the independent committee report, the independent committee recommended by a two to one vote that the Board not approve matters related to the proposed GCM transaction."

*The Closing*

On May 20, 2004, Galloway, on behalf of GCM, sent a signed memorandum to French with the subject line "Waiver of Certain Provisions in Securities Purchase Agreement." The letter states, in relevant part

> As you know, we are planning to have a closing (the "Closing") tomorrow, May 20[sic], 2004 (the "Closing Date") of the transactions contemplated by the by this [sic] certain Securities Purchase Agreement (the "Agreement"), dated as of April 23, 2004, between the GCM Securities Partners, LLC ... (the "Purchaser") and Reliance Security Group, PLC ... ("Reliance"). We acknowledge that the conditions set forth in Sections 6.3(c), (d) and (e) of the Agreement have not been and will not be satisfied by the Closing Date. Notwithstanding the foregoing, it is our desire to complete the Closing by the Closing Date, as the failure to do so could result in the reinstatement of certain rights of first refusal to William Vassell with respect to the sale

of the securities to be purchased by us pursuant to the Agreement. Accordingly, the Purchaser hereby waives the conditions to Closing set forth in Sections 6.3(c), 6.3(d) and 6.3(e) of the Agreement.

[Bainton Moving Decl., Exh. B].

On May 21, 2004, GCM paid to Reliance the entire purchase price of $2.85 million, and Reliance delivered to GCM certificates evidencing ownership of the Command securities. [Supp. Galloway Decl., ¶ 17]. GCM has produced a letter, from counsel for GCM to Citigroup, dated May 21, 2004, showing a wire transaction in the amount of $2.85 million from counsel for GCM to Citigroup Account No. 37317968. [*Id.*]

*The Public Disclosures*

On May 25, 2004, Reliance filed a Schedule 13–D in which it disclosed the sale and GCM's waiver of all of the Purchase Agreement conditions. The Schedule 13–D stated, in relevant part,

> The closing under the Stock Purchase Agreement was conditioned on a number of items, including, but not limited to: (i) the resignation of all members of the Company's Board of Directors that have been nominated or appointed by Reliance, (ii) the resignation or termination of William Vassell as an officer or employee of the Company and all of its subsidiaries, and (iii) the agreement by CIT Group Inc. that no default or event of default under its credit facility with the Company exists as of the closing or shall occur or have occurred as a result of the consummation of the transactions contemplated by the Stock Purchase

Agreement. Prior to the consummation of the transaction set forth in the Stock Purchase Agreement, the aforementioned conditions were all waived by GCM.

On May 26, 2004, GCM and Galloway filed Amendment No. 2 to their joint Schedule 13–D, reporting the consummation of the purchase of the Command Securities by GCM from Reliance pursuant to the terms of the April 23 agreement. The filing includes a copy of the April 23, 2004 Agreement.[3]

*The Press Releases*

On May 28, 2004, Command issued a press release in which a member of Command's board stated "until such time as the court rules on" the instant lawsuit, "it would be inappropriate for the Company to recognize Galloway's claim to ownership" of the securities that had been purchased from Reliance, and that existing "management [would] remain in control of the Company's operations" (the "May 28 Press Release"). [Galloway Decl., Exh. E].

On June 2, 2004, Command issued another press release stating that Vassell had announced that "he will continue to protect the interests of the public shareholders against an unwanted takeover by Galloway," and that he "expects to be successful in reversing the purported sale to Galloway" (the "June 2 Press Release"). [Galloway Decl., Exh. F].

PROCEDURAL HISTORY

On June 4, 2004, Vassell filed an Amended Complaint and an Order to Show Cause

---

**3.** Plaintiff points out that some differences exist between the versions of the April 23 Agreement appearing in Reliance's April 26, 2004 SEC disclosure and GCM's May 26, 2004 SEC Disclosure, and suggests that these differences "make a rational person wonder what really happened on May 21." None of the differences between the documents, however, involves provisions that are material to the ownership issue before this court, and none raises a triable issue of June 18, 2004 fact as to whether Reliance and GCM did in fact form an Agreement on April 23, 2004.

before this Court seeking to add GCM as a defendant to this action, to shorten the time for Defendants and GCM to answer the Amended Complaint, to enjoin Command from registering the transfer of the Command Securities from Reliance to GCM, and for consolidating the preliminary injunction hearing with a jury trial on the merits. Command notified the Court that it did not object to Plaintiff's request for relief.

On June 8, 2004, Defendant Reliance and proposed Defendant GCM (the "Moving Defendants") jointly submitted a competing Order to Show Cause. The Moving Defendants' Order to Show Cause sought a preliminary and permanent injunction against Vassell and Command, their agents, attorneys, representatives and employees from (1) interfering with (a) the registration on the books and records of Command of the sale of the Command Securities; (b) the exercise by GCM of any of its rights as a shareholder of Command that are attributable to ownership of the Command Securities; or (c) the exercise, by the Reliance Board Members of any of the powers that may be exercised by a disinterested director of Command, including but not limited to the power to propose, second and vote on resolutions; (2) issuing in Command's name any public statement that relates to the sale by Reliance to GCM of the Command Securities that has not been approved by a majority vote of Command's entire Board of Directors; or (3) causing the so-called "Independent Committee" of Command's Board of Directors to take or purport to take any action on any matter in lieu of Command's full Board of Directors. In addition, Moving Defendants sought to strike Vassell's demand for a jury trial pursuant to Fed. R.Civ.P. 39.

After reviewing the papers submitted by the parties in support of their Orders to Show Cause, I determined that the issues relevant to the requests for injunctive relief concerning the registration of shares and the exercise of GCM's rights could be disposed of on a motion for summary judgment. Accordingly, I ordered the parties to file additional motion papers in support of such a motion, and scheduled oral arguments for June 18, 2004 at 10 A.M.

On June 8, 2004, GCM filed an Answer to the Amended Complaint and Counterclaims. The Counterclaims seek (a) dismissal of Vassell's Amended Complaint; (b) a declaratory judgment that GCM is the lawful owner of the Command securities that it has purchased from Reliance, and an injunction against Vassell from taking any action that interferes with the registration of those shares in GCM's name or the exercise by GCM of its powers as shareholder of Command; (c) an award to GCM and Vassell of compensatory and punitive damages against Vassell, Nekos and Miller for their various breaches of fiduciary duty, and preliminary and permanent injunctive relief against such actions or the appointment of a temporary receiver to manage Command, and recovery of legal fees expended by GCM on Command's behalf; (d) compensatory and punitive damages against Vassell, Nekos and Miller for interference with GCM's contract with Reliance for the sale by Reliance to GCM of Reliance's Command Securities; and (e) compensatory and punitive damages for the issuance of public statements relating to the GCM/Reliance Purchase Agreement without the approval of the full Command Board of Directors.

On June 10, 2004, Reliance filed an answer with affirmative defenses to Vassell's Amended Complaint accompanied by various papers in support of Reliance's motion for summary judgment.

On June 14, Plaintiff Vassell responded by filing papers in support of its cross-motion, and Defendant Command filed a

cross-motion for summary judgment dismissing GCM's cross-claims against it.

I grant Moving Defendants' motions for summary judgment in part, and deny Vassell and Command's cross-motions.

## DISCUSSION

### I. Standard for a Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In this case, no genuine issues of material fact are in dispute. Resolution of the issues that are the subject of the cross-motions for summary judgment turn on legal arguments and the interpretation of an unambiguous contract, which is a matter of law for the court. "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous. If the contract is capable of only one reasonable interpretation, i.e., is unambiguous, we are required to give effect to the contract as written." *VKK Corp. v. National Football League*, 244 F.3d 114, 129 (2d Cir.2001) (citations omitted).

### II. Vassell's Affirmative Claims

#### A. *Nunc Pro Tunc Leave to Join GCM and Acceleration of Defendants' Time to Answer*

In its original briefing papers, Plaintiff requested leave under Fed.R.Civ.P. 21 to file an Amended Complaint adding GCM as a defendant. Plaintiff also asked the Court to shorten Defendants' time to respond to the Amended Complaint from the usual 10 days allowed under Fed.R.Civ.P. 15 to June 14, 2004. Defendants consented to the motion for leave *nunc pro tunc*, so that motion is granted. Defendants have each issued answers to Plaintiff's Amended Complaint, so Plaintiff's request for a shortened response time is moot.

The parties have also agreed that New York law governs the rights of the parties under the Shareholders' Agreement. [*See* Verified Compl., Ex. A].

#### B. *The Existence of an Agreement to Purchase the Command Shares Prior to March 1, 2004*

In its original moving papers, Plaintiff contended that Reliance's March

1 Letter to Vassell in combination with two oral conversations he had with French and Galloway around the same time constituted sufficient evidence that Reliance had reached agreement with GCM to sell its Command Securities for $2.85 in an all cash transaction at some point prior to March 1, 2004. But the plain language of the March 1 Letter does not state that such an agreement was already in existence—only that GCM could "complete very quickly" its purchase of Reliance's Command Securities. Plaintiff has submitted no other evidence in support of its claim. Indeed, Plaintiff now acknowledges that "The only agreement that Reliance entered into regarding the sale of its securities between February 15, 2004 and May 15, 2004 was (a) in writing; (b) between GCM and it; and (c) dated as of April 23, 2004." [Plf.'s 56.1 Statement, ¶ 13]. By contrast, Defendants have submitted documentary evidence showing that, as of March 2, 2004, they had specifically agreed not to be bound. *See Kreiss v. McCown De Leeuw & Co.*, 37 F.Supp.2d 294, 300 (S.D.N.Y.1999) (where term sheet expressly evidence an intent not to be bound until a final written agreement, there was no agreement). Accordingly, I find, as a matter of law, that no agreement existed between the Defendants to purchase the Command Securities prior to April 23, 2004.

## C. *The April 23, 2004 Purchase Agreement—"More Favorable Term"*

■ Vassell next asserts that Reliance breached its Shareholders' Agreement with Vassell and Command by entering into the April 23, 2004 Purchase Agreement to sell its Command Securities shares to GCM. In support of this claim, Vassell supplies the Court with a declaration from Pamela E. Flaherty, an attorney who specializes in corporate and securities law. Obviously, Ms. Flaherty's "expert"

opinion on how to interpret the agreement and whether its terms are "more favorable" than those offered to Vassell is not necessary and, indeed, is manifestly improper, so I give it no weight whatsoever. It certainly does not raise any genuine issue of fact.

However, Ms. Flaherty's affidavit sets out Plaintiff's arguments about the "more favorable term" issue more clearly than any other papers submitted by Plaintiff. I therefore consider Ms. Flaherty to be acting as co-counsel for Plaintiff and advancing an arguments on behalf of her "clients."

Plaintiff's position is as follows:

(1) The Shareholders' Agreement expressly precludes Reliance from selling or agreeing to sell its Command Securities to GCM on terms more favorable to GCM than those previously offered to Vassell in the January 16 Notice, without first reoffering the shares to Vassell.

(2) The Financing Agreement between CIT and Command (Section 10.1(j)) states that an "Event of Default" occurs immediately upon the sale by Reliance of "any of its shares" in Command "without obtaining the prior written consent of CIT."

(3) Reliance's January 16 Notice offered Vassell the option of purchasing the Command Securities for $2.85 million with no additional terms.

(4) The Purchase Agreement offered GCM the option of purchasing the Command Securities at $2.85 with the additional term or condition (Section 6.3(c)) that the sale could not be closed until GCM first obtained a written representation from the lender, CIT, that the sale of the Command Securities to GCM would not create an "Event of Default."

(5) The additional condition in the Purchase Agreement was "more favorable"

to GCM because Reliance required Vassell to purchase the shares whether or not CIT consented to the transaction and therefore required Vassell to bear substantial financial risk (as a shareholder of Command) of Command defaulting under the terms of Financing Agreement. By contrast, Plaintiff claims, GCM had the ability to waive the consent condition but was not required to do so, or to walk way from the transaction unless it had the prior written approval of CIT. By this logic, GCM had no risk in the transaction, and therefore was clearly put in a more favorable position than Plaintiff vis-a-vis the purchase of the Command Securities as a result of the Purchase Agreement.

Plaintiff's argument is unpersuasive.

Section 2.1 of the Shareholders' Agreement is perhaps the least ambiguous contract provision imaginable. For 90 days after Vassell failed to purchase the Command shares offered to him by Reliance, Reliance could not sell or agree to sell those shares on terms more favorable than those offered to Vassell.

The offer to Vassell was to have him buy the stock for $2.85 million. No other terms or conditions were attached to that offer.

The offer to GCM was to sell it the stock for $2.85 million, subject to the condition that it obtain the prior approval of CIT. In other words, all Vassell had to do was come up with the money, while GCM had to come up with the money and jump through a hoop (obtain CIT's approval). That placed *more* of a burden on GCM than on Vassell, not *less*. Requiring GCM to satisfy a condition that Vassell did not have to satisfy means the Agreement is less favorable to GCM—not more favorable.

Vassell (through Ms. Flaherty) argues that the CIT condition for GCM is actually more, rather than less, favorable to GCM because it gave GCM an "out" that Vassell did not have—once he accepted the terms offered to him, he would have been obliged to buy the stock and "bear the risk" that CIT would pull its financing from Command. The argument fails for two reasons.

First, the Financing Agreement—a pre-existing arrangement between CIT and Command—gave CIT the right to approve any purchaser of Reliance's shares, without limitation. Therefore, any offer made by Reliance to *any* potential purchaser (including Vassell) was automatically subject to that condition, whether the offer to purchase or any purchase agreement so stated or not. Including an express statement to that effect in the April 23 Agreement did no more than restate a condition that applied to any and every potential purchaser of Reliance's stock.

Second, and more important, there was no need to expressly state that CIT had to approve Vassell's purchase of Reliance's shares in the offer Reliance made to him, because Vassell was already pre-approved as the purchaser of those shares. CIT had expressly agreed to finance Command's operations as long as Vassell was running Command and remained a substantial shareholder. Nothing Vassell did that entrenched his control over the company (such as buying Reliance's stock, which would have made it impossible to interfere with his management of the company) could result in an Event of Default, because CIT had already indicated that it wanted and expected Vassell to be in charge.

But if Vassell was thrown out of office (which GCM could do if it obtained control of the company by exercising its warrants and converting its preferred stock), CIT had the right to declare a default and pull

its financing. So unlike Vassell, a third party purchaser such as GCM bore a substantial risk of purchasing a controlling stake in Command, only to find that the company had no financing. Thus, conditioning the sale to GCM on CIT's prior approval did no more than put GCM in *the same position* that Vassell already occupied by virtue of the terms of the Financing Agreement. It did not put GCM in a *better* position than Vassell. And by waiving the CIT approval condition, GCM put itself in a *worse* position than Vassell, since GCM now bears the risk that Vassell never would have faced—the risk that CIT will decide not to finance Command if Vassell is no longer in charge.

Under no circumstances, then, can the terms of the Purchase Agreement be deemed materially more favorable to GCM than the terms of the offer made to Vassell.

D. *The Purchase Agreement was Enforceable as of April 23, 2004*

■ Plaintiff also appears to argue that the Purchase Agreement, which was dated and executed on April 23, 2004, did not actually become a valid and enforceable agreement until May 20, 2004—the date when GCM waived the condition requiring CIT to approve the sale—because until that date, it was possible that GCM would not purchase the shares. As a result, Vassell claims, the 90 day period expired without Reliance having entered any agreement to sell its Command stock, thus requiring it to re-offer the shares to him.

This argument ignores the most basic principles of contract law. The Shareholders' Agreement gave Reliance 90 days following Vassell's refusal to buy the stock to *enter into an agreement.* A valid and binding executory contract was entered into on April 23, 2004. Indeed Vassell so admits in his Rule 56.1 Statement (¶ 13), which is binding on him in this litigation.

It is true that GCM's obligation to complete performance under that Agreement—to close on the purchase of the stock—was the fulfillment of a condition precedent to performance (obtaining CIT's approval). But that does not mean that no contract was in place before the expiration of the 90 day period.

Similarly, the fact that Section 7.1(b) of the Purchase Agreement provides that either party could terminate the Agreement if the closing did not take place before May 14, 2004 does not mean that there was no Agreement prior to May 14, 2004. Indeed, the very right to terminate the Agreement as of a certain time presupposes that there was in fact an Agreement to terminate! Furthermore, even under Plaintiff's reasoning, GCM and Reliance had an "agreement for the sale of the shares" by May 15, 2004, since neither party cancelled the agreement by May 14—the day before the expiration of the 90-day window.

I conclude that Reliance entered into an agreement for the sale of its Command shares on April 23, 2004, on terms no more favorable to GCM than those offered to Vassell. Thus, Reliance was not required to reoffer its shares to Vassell. Plaintiff's motion for summary judgment is therefore denied, and Moving Defendants' motions to dismiss Vassell's claims in their entirety are granted. GCM is also entitled to summary judgment on its counterclaim for a declaratory judgment that GCM is the lawful owner of the Command securities that it purchased from Reliance.

III. **Moving Defendants' Affirmative Claims**

■ GCM has also filed counterclaims seeking to enjoin Vassell and Command

from committing a number of alleged improprieties.

First, GCM seeks to prevent Vassell and Command from interfering with GCM's registration of the Command Securities in GCM's name. Second, GCM seeks to enjoin Vassell from interfering with GCM's exercise of its rights as a shareholder of Command, including, but not limited to, the power of GCM to call a special meeting. GCM's fear of interference with its shareholder rights stems from Command's decision to issue the May 28 and June 2 Press Releases relating to the sale by Reliance to GCM of the Command Securities.

Based on the documents I received Wednesday afternoon, June 15, 2004, it appears that the transfer of the Command Securities to GCM's name is now being processed, and will be completed by Tuesday, June 29, 2004, absent a cease and desist order from this Court. As I have ruled that Reliance's sale of its Command Securities was proper under the Shareholders' Agreement, no such order will be forthcoming.

While Command has indicated a willingness to take all steps necessary to comply with this Court's decision on the Command Securities ownership issue (including the registration of the Command Securities in GCM's name on its books and records), I note that Command's prior dealings with dissident shareholders coupled with Vassell's history (which led the company into receivership), creates a doubt in my mind that it will do so. I am therefore enjoining it, and its Board of Directors, to do nothing to interfere with the registration of GCM's shares or Command's books or take any action to interfere with GCM's rights once it becomes a shareholder of record.

GCM also asks the Court to direct Command "to hold its annual meeting of shareholders on the fourth Wednesday of July 2004, as required by Article II, § 2, of Command's by-laws." Finally, GCM seeks to enjoin Command (and Vassell) from: (1) interfering with the exercise of the Reliance Directors of any powers that may be exercised by a disinterested director; (2) issuing any public statements regarding the Reliance/GCM transaction that has not been approved by a majority vote of Command's entire Board; and (3) causing the Independent Committee of Command's Board of Directors to take or purport to take any action on any matter in lieu of Command's full Board of Directors. GCM also asks the Court to direct Command to disband the "Independent Committee."

I am unable to address these requests for relief on the record before me because I do not have the evidence needed to determine whether GCM is likely to succeed on claims that such conduct by Vassell and Command would be wrongful. Counsel for Reliance has indicated that it (and, after transfer, GCM) has a right under Command's by-laws to demand a special meeting of shareholders, even thought it only owns 25% of Command's shares. Unfortunately, I do not have the by-laws or a copy of any demand for such a meeting, so I am hardly in a position to draw any conclusions one way or the other. In any event, the better part of valor would seem to be to see what happens after the shares are registered. The injunction I am entering, which prohibits Command and Vassell from interfering with GCM's rights as a shareholder, would seem sufficient for the time being.

## IV. The Court Directs the Entry of Final Judgment as to All Issues Herein Resolved

"Fed.R.Civ.P. 54(b) allows a district court to direct the entry of final judgment as to one or more but fewer than all of the claims in a case 'upon an express determi-

nation that there is no just reason for delay and upon express direction for the entry of judgment.'" *AIH Acquisition Corp. LLC v. Alaska Indus. Hardware, Inc.,* No. Civ.A. 02–7939(RO), 2004 WL 1109527, at *1 (S.D.N.Y. May 18, 2004). "Whether to direct entry of final judgment in this matter is within the court's discretion." *Id.* (citing *Cullen v. Margiotta,* 811 F.2d 698, 711 (2d Cir.1987)).

Here, there is no just reason to delay entry of the judgment in favor of Moving Defendants. Entry of judgment at this time will facilitate an immediate appeal of the time-sensitive issues herein determined. It also promotes the conservation of judicial resources, because final resolution of the ownership issue will most likely cause many of the other counterclaims asserted in this case to become moot.

This court therefore certifies, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay in the entry of a separate final judgment dismissing Plaintiff's Amended Complaint; declaring that GCM is the lawful owner of the Command securities that it purchased from Reliance; and enjoining Vassell and Command and all persons acting in concert with them from interfering with GCM's registration of the Command Securities in GCM's name or with GCM's exercise of its rights as a shareholder of Command.

## CONCLUSION

Reliance and GCM are directed to provide the Court by Monday at 9 AM a form of order embodying the Court's award of summary judgment dismissing the Amended Complaint, declaring that GCM is the lawful owner of the Command securities that it purchased from Reliance; and preliminarily and permanently enjoining Vassell and Command and all persons acting in concert with them from interfering with

GCM's registration of the Command Securities in GCM's name or with GCM's exercise of its rights as a shareholder of Command.

If Vassell takes an appeal from that judgment (as I anticipate he will), the Court should be notified immediately upon resolution of that appeal, and I will schedule a Rule 16 conference to deal with what (if anything) is left of the case, including GCM's counter/cross claims for damages. Counsel for Reliance and Vassell are directed to notify the Court if no appeal is taken, and a Rule 16 conference will be scheduled forthwith.

This constitutes the decision of the Court.