William C. VASSELL, Plaintiff,

v.

RELIANCE SECURITY GROUP, PLC, Command Security Corporation, and GCM Security Partners, LLC, Defendants.

GCM Security Partners, LLC, Counterclaim Plaintiff,

v.

William C. Vassell, Command Security Corporation, Peter J. Nekos and Gregory J. Miller, Counterclaim Defendants.

No. 04 CIV. 2657(CM)GAY.

United States District Court, S.D. New York.

July 29, 2004.

J. Joseph Bainton, John Gerard McCarthy, Sr., Bainton McCarthy LLC, New York City, for Plaintiff.

Jay Warren Freiberg, Katten Muchin Zavis Rosenman, New York City, James Martin Reilly, Herzog, Engstrom & Koplovitz, P.C., Albany, NY, for Defendants.

Jeffrey Louis Braun, Kramer, Levin, Naftalis & Frankel, LLP, New York City, for Defendants and Counter Claimant.

## MEMORANDUM DECISION AND ORDER GRANTING GCM'S MOTION TO ENFORCE THIS COURT'S PRIOR ORDER

MCMAHON, District Judge.

### BACKGROUND

This action arises out of an ongoing dispute between corporate insiders over the sale and transfer of certain securities (the "Command Securities") in the Command Security Corporation ("Command"). On May 24, 2004, GCM Security Partners, LLC ("GCM") purchased from Reliance Security Group ("Reliance") the Command Securities, including a certificate representing 12,325.35 shares of Command's Series A convertible Non–Voting preferred stock. William C. Vassell ("Vassell") brought an action in this Court seeking, among other things, to enjoin Command from registering the Command Securities. GCM counterclaimed seeking, among other things, to enjoin Vassell and Command from interfering with the sale and registration of securities. On June 18, 2004, I issued a Decision and Order declaring that GCM was the lawful owner of the Command Securities, and enjoining "Vassell and Command, their agents, attorneys, employees and representatives and all persons acting in concert with them," from "interfering with (a) the registration of the Command Securities in GCM's names on Command's books and records, or (b) the exercise by GCM of any rights as the owner of the Command Securities or as a shareholder of Command." *Vassell v. Re-*

*liance Security Group, PLC,* 322 F.Supp.2d 459, 467 (S.D.N.Y.2004) (*Vassell I* ).

On June 21, 2004, Command's transfer agent delivered to GCM's attorneys a certificate evidencing GCM's ownership of the 1,617,339 shares of Command's common stock that GCM had acquired from Reliance.

On June 22, 2004, Vassell filed a notice of interlocutory appeal from the June 18, 2004 Decision and Order.

On June 24, 2004, GCM delivered to Command GCM's certificate evidencing ownership of 12,325.35 shares of Command's Series A convertible preferred stock and notice of GCM's election to exercise its right to convert those shares to 1,232,535 shares of Command's common stock.

On July 6, 2004, Command's Board of Directors held a meeting at which, among other things, the directors voted not to recognize the issuance of the additional shares of Common stock to GCM, pending the receipt of advice from "independent counsel" on the legality of the conversion. The Board also scheduled August 4, 2004, as the record date for Command's annual meeting of shareholders. Under Command's by-laws, this record date is the controlling date "[f]or the purpose of determining the shareholders entitled . . . to vote at [the] meeting shareholders or any adjournment thereof." (Declaration of Andrew Hulsh, Ex. E.) If GCM's ownership of these additional shares of common stock is established prior to August 4, 2004, then GCM will be the holder of more than 50% of the shares of Command's common stock entitled to vote at the 2004 annual meeting, and will be able to control the outcome of matters to be submitted for shareholder approval—including the election of directors. (*Id.*)

On July 12, 2004, Command's counsel advised GCM's attorneys that the "inde-pendent counsel," Nixon Peabody, had advised Command that, while there is no direct precedent in New York, the "better view" was that Section 912 of the New York Business Corporation Law ("BCL"), New York's Anti–Takeover statute, bars the conversion of GCM's convertible preferred stock to common stock. (Order to Show Cause ¶ 11.) Following discussion by the Board members, the Board voted not to issue common stock for the preferred shares on the basis that such issuance would be an illegal act.

GCM now asserts that Command's refusal to allow the stock conversion violates this Court's prior determination, specifically, my order that Command do nothing to interfere with the exercise by GCM of its rights as owner of the Command Securities—and makes this motion to enforce, clarify or supplement the June 18 Order.

## DISCUSSION

Section 912(b) of the BCL states, in relevant part, the following:

no domestic corporation shall engage in any business combination with any interested shareholder of such corporation for a period of five years following such interested shareholder's stock acquisition date *unless* such business combination or the purchase of stock made by such interested shareholder on such interested shareholder's stock acquisition date is approved by the board of directors of such corporation prior to such interested shareholder's stock acquisition date.

N.Y. BUS. CORP. LAW § 912(b) (McKinney's 2001) (emphasis added).

In other words, the statute prohibits "a New York corporation from entering into a 'business combination' with any shareholder owning 20 percent of the corporation's stock until the shareholder has held the stock for at least five years, unless the

shareholder first secures board approval." *See WHX Corp. v. Sec. and Exch. Comm'n,* 362 F.3d 854, 855 (D.C.Cir.2004).

The parties disagree over whether § 912 applies to GCM's preferred stock conversion transaction. Command contends that the conversion of GCM's shares falls within the plain meaning of the statute. GCM argues that the conversion transaction is not a "business combination" within the meaning of § 912(b), or at least that it is not the type of transaction against which the statute was designed to protect. Alternatively, GCM argues that Command has opted out of § 912.

Under the BCL, a "business combination" is defined to include, among other things,

> the issuance or transfer by such corporation [i.e. Command] ... (in one transaction or a series of transactions) of any stock of such corporation ... which has an aggregate market value equal to five percent [5%] or more of the aggregate market value of all the outstanding stock of such corporation to such interested shareholder ... except pursuant to the exercise of warrants or rights to purchase stock offered, or a dividend or distribution paid or made, pro rata to all shareholders of such corporation.

N.Y. Bus. Corp. Law § 912(a)(5)(C) (McKinney's 2001).

> A "business combination" also includes any reclassification of securities (including, without limitation, any stock split, stock dividend, or other distribution of stock in respect of stock, or any reverse stock split), or recapitalization of such corporation, or any merger or consolidation of such corporation with any subsidiary of such corporation, or any other transaction (whether or not with or into or otherwise involving such interested shareholder), proposed by, or pursuant to any agreement, arrangement or understanding (whether or not in writing)

with, such interested shareholder ... which has the effect, directly or indirectly, of increasing the proportionate share of the outstanding shares of any class or series of voting stock or securities convertible into voting stock of such corporation ... which is directly or indirectly owned by such interested shareholder ... except as a result of immaterial changes due to fractional share adjustments

§ 912(a)(5)(E).

■ Assuming *arguendo* that the conversion transaction is a "business combination," I agree with GCM that it is entitled to convert its preferred stock to common stock because Command has opted out of § 912.

### I. The Opt–Out Provision

Section 912(d)(3) establishes the right of a corporation to "opt out" of coverage under the statute. For example, § 912 would not apply to GCM's conversion transaction if Command's

> (i) ... original certificate of incorporation ... contains a provision expressly electing not to be governed by this section, or ... (iii) [if Command] adopts an amendment to [its] by-laws, approved by the affirmative vote of a majority of votes of the outstanding voting stock of [Command], excluding the voting stock of interested shareholders and their affiliates and associates, *expressly electing not to be governed by this section,* provided that such amendment to the by-laws shall not be effective until eighteen months after such vote of [Command's] shareholders and shall not apply to any business combination of [Command] with an interested shareholder whose stock acquisition date is on or prior to the effective date of such amendment.

§ 912(d)(3) (emphasis added).

GCM argues that Command "opted out" of § 912 by amending its Certificate of

Incorporation in November 1992 to create a comprehensive anti-takeover regime, and that the Article explicitly is "subject to" the conversion rights of the holders of preferred stock. Command denies this, arguing that (1) the amendment was intended only to supplement, not to abrogate, its protections under § 912, and (2) the anti-takeover regime in Article NINTH is subject only to the voting rights of preferred stockholders, not all rights of such stockholders.

### A. *The 1992 Amendment Superceded BCL Section 912*

On November 20, 1992, Command amended its Certificate of Incorporation to add a new Article NINTH. At the same time, Command also adopted a Restated Certificate of Incorporation dated November 20, 1992, which contained the same Article NINTH. (*See* Hulsh Decl., Ex. J.)

As a threshold matter, it is clear that 1992 amendment to Command's Certificate of Incorporation is the equivalent to an amendment of its by-laws for the purposes of the BCL. BCL § 402(c) specifically provides that a corporation's certificate of incorporation "may set forth any provision, not inconsistent with this chapter or any other statute of this state, relating to the business of the corporation, its affairs, its rights or powers, *or the rights or powers of its shareholders*, directors or officers *including any provision relating to matters which under this chapter are required or permitted to be set forth in the by-laws.*" § 402(c) (emphasis added). *See also Raub v. Gerken*, 127 A.D. 42, 111 N.Y.S. 319, 321 (2d Dep't 1908) (referring to the articles of incorporation and by-laws as the most fundamental laws governing a corporation). Therefore, if the 1992 Amendment to the Certificate of Incorporation supercedes BCL § 912, it meets the requirements of the statute.

Command argues that for it to have "opted-out" of Section 912, it had to do so "explicitly." The question for this Court is whether Article NINTH is sufficiently "explicit" to constitute an "express election" by Command to waive the protections of § 912 in favor of those set forth in the Certificate of Incorporation. I find that it is.

Although no court has yet examined the meaning of the term "expressly electing" as used in § 912, the Second Circuit has addressed the requirements of statutory "waiver" in other contexts. For instance, in *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255 (2d Cir. 2003), the Court stated that an "explici[t] waive[r]" under the Foreign Services Immunities Act (FSIA) for immunity from prejudgment attachment "does not require recitation of 'the precise words "prejudgment attachment" in order to waive immunity' " and, instead, only "must be explicit in the common sense meaning of that word" in that "the asserted waiver must demonstrate unambiguously the foreign state's intention to waive its immunity from prejudgment attachment in this country." *Banco de Seguros*, 344 F.3d at 261 (emphasis added). *See also Libra Bank Limited v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47, 49 (2d Cir.1982) (rejecting argument that a waiver under the FSIA "must recite the words 'prejudgment attachment' *in haec verba* or otherwise must contain an express reference to this form of legal proceeding"). By analogy, an express election by Command to waive the BCL's statutory scheme will be found where an amendment to a corporation's by-laws or articles of incorporation unambiguously demonstrates the corporation's intention to waive its protections under BCL—not just where the resolution adopting the amendment states, "We expressly elect not to be governed by BCL Section 912."

With that in mind, I turn to Article NINTH of the amended and restated Certificate of Incorporation of Command. It states, in relevant part, the following:

(A) Subject to the provisions of any series of preferred stock which may at the time by outstanding, the affirmative vote of the holders of not less than eighty percent (80%) of the outstanding shares of common stock of the corporation, which shall include the affirmative vote of the holders of at least fifty percent (50%) of the outstanding shares of common stock held by shareholders other than the "related person" (as hereinafter defined), shall be required for the approval or authorization of any "business combination" (as hereinafter defined) of this corporation with any related person; provided, however, that such eighty percent (80%) voting requirement shall not be applicable if:

(1) The business combination is approved by a majority of the entire board of directors of the corporation either (a) prior to the acquisition by such related person of the beneficial ownership of twenty percent (20%) or more of the outstanding shares of common stock of the corporation, or (B) after such acquisition, but only so long as such related person seeks and obtains the unanimous approval by the board of directors of such acquisition of more than twenty percent (20%) of the common stock prior to such acquisition being consummated
. . . .

. . . . .

(B) For purposes of this Article NINTH:

(1) The term "business combination" shall mean: (a) any merger or consolidation of this corporation with or into a related person; . . . (c) any merger or consolidation of a related person with or into this corporation or a subsidiary of this corporation; (e) the issuance of any securities of this corporation . . . to a related person . . .; (f) the acquisition by this corporation . . . of any securities of a related person; (g) any reclassification of common stock of this corporation, or any recapitalization involving common stock of this corporation, consummated within five years after a related person becomes a related person; and (h) any agreement, contract or other arrangement providing for any of the transactions described in this definition of business combination.

(Hulsh Decl., Ex. J.)

Here, the language of Article NINTH, while not explicitly saying, "Command is waiving BCL § 912," nonetheless clearly evinces an intention to supercede it. This intent becomes most apparent upon a comparison of the relevant sections of § 912 and Article NINTH. If, as Command suggests, Article NINTH was adopted only to supplement § 912, then one would expect it to contain many provisions. Instead, the two schemes often conflict with one another, and contain numerous similar, but not identical, definitions, standards and requirements.

For example, while § 912 and Article NINTH both use the term "business combination" and define the term broadly, the definitions are not identical. Section 912(a)(5) includes in the definition of a "business combination" a merger with a corporation that would become an affiliate of the "interested shareholder" after the merger, while Article NINTH does not include such a transaction. Section 912 includes plans of dissolution while Article NINTH does not. Section 912 applies to the receipt by an "interested shareholder" of financial benefits that are out of proportion with the shareholder's stock interest, while Article NINTH does not. Section 912 contains a 5% threshold for the aggregate market value of voting stock issued to

an "interested shareholder" while Article NINTH contains no threshold. Section 912 applies to reclassifications and recapitalizations that increase the proportion of voting stock held by an "interested shareholder" while Article NINTH applies to all reclassifications and recapitalizations.

Section 912 also contains its own definitions of an "affiliate," "associate" and "beneficial owner," while Article NINTH defines those terms with reference to their meaning under the SEC's rules adopted pursuant to the Securities Exchange Act of 1934.

Finally, § 912(a)(10)(B) provides that unissued shares not attributable to the shareholder at issue are not taken into account in computing the shareholder's percentage interest of voting stock for purposes of determining whether the shareholder is an "interested shareholder"—a provision that is unfavorable to the shareholder. Article NINTH contains no similar provision.

Various additional examples of conflict between § 912 and Article NINTH exist. In fact, if § 912 and Article NINTH both applied to any given "business combination," the generally narrower Article NINTH would become effectively meaningless.

I also find unpersuasive Command's argument that its adoption of Article NINTH was motivated by concern that § 912 might be struck down as unconstitutional, as had happened to anti-takeover statutes in other states in the early 1980's. *See e.g., Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (striking down as unconstitutional Illinois anti-takeover statute). First, no such rationale was articulated in the unanimous written consent of the Board of Directors pursuant to which Article NINTH was adopted. (*See* Declaration of David J. Politzer, Ex. 3.) Second, the argument defies logic. If Command had been concerned

about the constitutionality of § 912, it would not merely have sought to supplement § 912—it would have sought to opt out of § 912 entirely, in order remove its protections as much as possible from the whims of legislative or judicial fiat.

### B. *Article NINTH Provides That Its Provisions Are "Subject to" Rights of Preferred Stockholders*

Article NINTH opens with the express disclaimer that it is "[s]ubject to *the provisions* of any series of preferred stock which may at the time be outstanding." (Hulsh Decl., Ex. J) (emphasis added). Command now argues that this clause refers only to the *voting rights* of holders of preferred stock, as allegedly evidenced by the fact that the language immediately precedes language about voting by holders of common stock. Command is incorrect.

First, the language of Article NINTH is not limited to voting rights. The disclaimer says that the anti-takeover provisions in Command's Certification of Incorporation are subject to "the provisions" of "any series of preferred stock." The voting rights of a preferred series are but one of many "provisions" of the series.

Second, as Command itself notes, "Where an agreement is 'subject to' the terms of another document, the agreement will be governed by *inconsistent* provisions in that other document." *Hellenic Lines Ltd. v. Embassy of Pakistan,* 467 F.2d 1150 (2d Cir.1972) (emphasis in original). Thus, the language in Article NINTH that makes the Article "subject to" the rights of preferred stockholders necessarily means that the approval requirements established by Article NINTH do not apply to the exercise by a preferred stockholder of inconsistent contract rights that are established elsewhere in Command's Certificate of Incorporation.

In this case, GCM's conversion rights are established by Article FOURTH, as amended on February 24, 1995, which states, in relevant part,

The Board of Directors designates the rights, preferences and limitations of a series of Preferred Stock as follows:

## SERIES A CONVERTIBLE PREFERRED STOCK

. . . . .

Part 4. *Conversion.*

*(i) Any holder of Series A Preferred Stock may, at any time that a sufficient number of shares of common stock are authorized for issuance, convert all or any portion of the Series A Preferred Stock ... held by such holder into a number of shares of the Corporation's Common Stock ...*

(ii) Each Conversion of Series A Preferred Stock will be deemed to have been effected as of the close of business on the date on which the certificate or certificates representing the Series A Preferred Stock to be converted have been surrendered at the principal office of the Corporation. At such time as such conversion has been effected, the rights of the holder of such Series A Preferred Stock as such holder will cease and the person or persons in whose name or names any certificate or certificates for shares of Common Stock are to be issued upon such conversion will be deemed to have become the holder or holders of record of the shares of Common Stock represented thereby.

. . . . .

Part 6. *Voting.*

The Series A Preferred Stock shall be non-voting, except as required by the Business Corporation Law of New York; provided that the Series A Preferred Stock shall be voting (as if it were share of common stock), and each shares shall have the number of votes per share as if it had been converted, until the Corporation has authorized and reserved for issuance such number of shares of common stock as is necessary to allow conversion of all shares of Series A Preferred Stock.

Part 7. *Redemption.*

*Mandatory Redemption.* To the extent that all outstanding principal and all accrued and unpaid interest, late fees and penalties on the Subordinated Debt is paid in full, the Corporation, shall purchase and redeem, out of funds legally available for such purpose, all of the outstanding shares of Series A Preferred Stock at a redemption price per share, payable in cash ...

. . . . .

(Hulsh Decl., Ex. K) (emphasis added).

Finally, the placement of the "subject to" language in Article NINTH immediately prior to reference to the approval rights of holders of common stock does not support Command's contention that the language only applies to the voting rights of the preferred stock. The language in Article NINTH to which Command refers—that is, the introductory sentence of Paragraph (A) of Article NINTH—is the core operative provision of Article NINTH. The point of Article NINTH is to require approval by specified percentages of holders of common stock, as set forth at the outset of Paragraph (A), of various transactions that are defined elsewhere in Article NINTH. Therefore, the "subject to" language at the very beginning of Article NINTH is properly understood to refer to Article NINTH in its entirety, not just to one component of that Article. Furthermore, had the drafters of Article NINTH intended to limit the scope of the "subject to" language to the voting rights of holders of preferred stock, they easily could have done so by using the specific phrase "voting rights" instead of referring broadly

and generally, and without any differentiation, to the "provisions" of the "series of preferred stock" that would be outstanding at the relevant time.

Significantly, one could not simply go out into the open market and buy shares of Command's preferred stock. The Board of Directors created this stock and carefully spelled out, in the 1995 amendment to Article FOURTH (*see* Hulsh Decl., Ex. K), the conversion rights of the holders of that stock, with no mention of any limitation on those rights allegedly arising under Article NINTH (or, for that matter, § 912). The rights of the holders of the preferred stock are a matter of contract between the holders of the stock and the corporation (*see, e.g., Kimeldorf v. First Union Real Estate Equity and Mortgage Invs.,* 309 A.D.2d 151, 160, 764 N.Y.S.2d 73, 79 (1st Dep't 2003)), and the only reasonable interpretation of the language of that contract—that is, the relevant provisions of Command's Certificate of Incorporation, as amended— is that the conversion rights of the Series A convertible preferred stock are not affected by Article NINTH, and that Article NINTH is subject to the rights of the preferred shareholders.

## II. This Motion is Procedurally Proper

■ Command also argues that the present motion is untimely under Federal Rule of Civil Procedure 59(e) and does not seek relief on a claim that is pending before the Court.

This is not a Rule 59(e) motion to alter or amend a judgment. GCM's motion is properly characterized as a motion to enforce the judgment previously entered. Indeed, Command concedes "the Court's continuing jurisdiction to enforce its judgment" (Command Opp. Mem., p. 18). In my June 18, 2004 decision, I enjoined "Vassell *and Command,* their agents, attorneys, employees and representatives,

and all persons acting in concert with them" from "interfering with . . . the exercise by GCM of any rights as the owner of the Command Securities or as a shareholder of Command." *Vassell I,* at 473. Included in the definition of the term "Command Securities" were the "12,325.35 shares of Command's Series A convertible preferred stock, $.0001 part value per share." Because § 912 does not prevent the exercise of GCM's conversion rights, and because Command has not offered any other legitimate reason for refusing to recognize GCM's conversion rights, I find that Command's determination not to allow GCM to convert its Series A convertible preferred stock interferes with GCM's rights as an owner of the Command Securities under the terms of my June 18 order and violates the terms of the judgment previously entered.

I therefore enjoin Command and its Board from taking any further actions that prevent GCM from exercising its conversion rights as the owner of preferred shares in Command.

## CONCLUSION

Accordingly, GCM's motion to enforce the June 18 Order and Decision prohibiting Command and its Board from taking any actions that prevent GCM from exercising its conversion rights as the owner of preferred shares in Command is GRANTED.